Linda W. v Frank T. (2004 NY Slip Op 51657(U))

[*1]

Linda W. v Frank T.

2004 NY Slip Op 51657(U)

Decided on July 19, 2004

Family Court, Suffolk County

Simeone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 19, 2004

Family Court, Suffolk County
LINDA W., Petitioner,
against
FRANK T., Respondent.
V-13130-03A

Petitioner's AttorneyRespondent's AttorneyLaw Guardian
Edward Emanuel, Esq. Paul DeJesse Jr., Esq.Jane Bernstein, Esq.
300 Old Country Rd.500 Montauk Hwy., Suite NLaw Guardian Bureau
Mineola, NY West Islip, NY 11795400 Carleton Ave.
Central Islip, NY 11722

Ettore A. Simeone, J.
This litigation involves these parents and their ten year old son Matthew. In this proceeding, each party is seeking to modify the existing order of custody that was entered by Honorable Bruce Cozzens, Jr. on February 6, 1998 and for this court to find the other in contempt of court. The current order awards the parents joint legal custody with shared parenting time. The father had Matthew commencing at 12:00 p.m. on Wednesday of each week, and continuing through until 4:00 p.m. on Friday of each week, except that on alternate weeks, such physical possession shall extend to Saturday at 10:00 a.m. In addition, the father shall have physical possession of Matthew at 10:00 a.m. on Sunday of each week and continuing through and until 10:00 a.m. on Monday of each week. The mother shall have physical possession of Matthew at all other times. The parties' were permitted to adjust their schedules accordingly with the consent of the other, and did so in 1999 and again in 2001. The order also made provisions for holidays.
In support their respective petitions, each party accuses the other of making numerous unilateral decisions involving Matthew in direct contradiction to the terms of the parties' Divorce Judgment. Further, each claim that Matthew's needs would be best met if he resided with them, respectively.
This Court conducted a thirteen day trial to determine the validity of the allegations contained within all of the petitions. Upon the conclusion of said trial, the mother argued that it would be in the child's best interest to award her residential custody of Matthew . She said that she has been the primary caretaker of Matthew since birth and has dedicated her life to him. The mother argues that she would continue to encourage and facilitate the respondent's relationship with Matthew, but fears that the respondent would not do the same if he were granted custody.
The father contends that it would be in Matthew's best interest to award residential custody to him. He avers that Matthew needs his father and that they have a closer emotional [*2]bond than Matthew does with his mother. He also expressed concerns about the mother facilitating a relationship between the respondent and Matthew if awarded custody.
 The Law Guardian's position is that it is in Matthew's best interest to reside with his mother. The Law Guardian argues that although both parents have a wonderful and loving relationship with Matthew, the father would impede the relationship between Matthew and his mother. The Law Guardian recommends that the father be granted liberal visitation to maintain his strong relationship with Matthew.
Upon having heard the testimony and reviewing the applicable law, this Court determines a follows:
LAW
The petitioning party seeking a change of custody must show a sufficient change in circumstances reflecting a real need for change in order to insure the continued best interest of the child (see, Carnrike v. Kasson, 291 AD2d 680 (3d Dept. 2002); see also, Fox v. Fox, 177 AD2d 209 (4th Dept. 1992)). In determining the best interest of the child where a change of custody is sought, the court considers such factors as the original placement of the child, the length of that placement, relative fitness of parents, quality of home environment, parental guidance given to the child, parents' financial status, and parents' ability to provide for the child's emotional and intellectual development (Dr. Santoro v. Dr. Santoro, 638 NYS2d 4789 (2d Dept. 1996)). Custody of children should be established on a long term basis, wherever possible; children should not be shuttled back and forth between divorced parents merely because of changes in marital status, economic circumstances or improvements in moral or psychological adjustment, at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian (Matter of Lang v. Lang, 9 AD2d 401, 409, affd 7 NY2d 1029 (1st Dept. 1959); see also, Matter of Wout v. Wout, 32 AD2d 709 (3d Dept. 1969)).
The court should also consider the effect that an award of custody to one parent might have on the child's relationship with the other parent (J.F. v. L.F., 694 NYS2d 592 (NY Family Court 1999)). "Interference with the relationship between a child and a noncustodial parent by the custodial parent has been said to be an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent." (In the Matter of Carl J.B. v. Dorothy T., 186 AD2d 736 (2d Dept. 1992)).
It is important for the court to consider the desires of the child. While not determinative, the child's expressed preference is some indication of what is in the child's best interests. Of course, in weighing this factor, the court must consider the age and maturity of the child and the potential for influence having been exerted on the child (see, Eschbach v. Eschbach, 56 NY2d 167 (1982)).
The court should also be reluctant to separate siblings, and thus sibling relationships will not be disrupted where there is no overwhelming need to do so (see, Eschbach v. Eschbach, supra . at 173; Salerno v. Salerno, 273 AD2d 818 (4th Dept. 2000).
Where the court appoints a forensic psychologist, that expert's opinion is a factor for the court to consider, but that opinion is not determinative (see, Matter of Aldrich v. Aldrich, 263 AD2d 579 ( 3rd Dept. 1999 )). The Family Court would be seriously remiss if it delegated its fact finding role and ultimate determination to the psychologist (see, Matter of Betancourt v. Boughton, 204 AD2d 804 (3rd Dept. 1994)).
[*3]
FACTS
Linda T., the respondent's current wife, testified that she met the respondent and was engaged on December 24, 2000. The two have lived together since March 2002 and were married October 5, 2002. She and the respondent own a four bedroom high ranch in West Islip. The two live with her two children from her first marriage and her stepson Matthew, the subject child. She is employed as an accountant.
Mrs.T. expressed a sincere affection for Matthew and described him as "a ray of sunshine". Although she loves Matthew and seems fully involved in his life, Mrs. T. stated she would never try to replace his mother. She described the family's routine week with errands, games and family dinners. She described Matthew as fully integrated into the family. She also described several family vacations indicating a close knit unit. She further described her wedding as one involving all of the children. Matthew walked his father down the aisle and they all took a family vow committing themselves to each other. Mrs. T. described the relationship between the respondent and Matthew as "warm", "loving", "caring", "an incredible bond", "best friends".
To the contrary, Mrs. T. described incidents involving the petitioner which indicated a troubled relationship with Matthew. Specifically, Mrs. T. testified to two situations where the petitioner failed to include or even inform Matthew of major events that had a direct impact on his life: petitioner's wedding to her current husband, and the most recent move from Baldwin to Stony Brook. Mrs. T. described Matthew's reaction when he first heard of each event over the telephone and how distressed he was. The respondent was forced to explain the situation to Matthew who was obviously upset, saying "it broke my heart". She further testified to an event involving the birth of Matthew's biological brother. Mrs. T. testified that petitioner gave birth to Matthew's half-brother in May of 2003 on a weekend that the respondent had Matthew and had planned a sleep over birthday party for him. Mrs. T. testified that the petitioner called the home, but never requested of the witness that Matthew be brought to the hospital to visit with his new brother. However, Mrs. T. testified that the petitioner did make such a request to Matthew, and when Matthew forgot to mention such to her or Mr. T. , the petitioner's reaction upset Matthew to the point of crying.
Finally, Mrs. T. described several incidents clearly portraying a complete breakdown of communication between the petitioner and respondent to the point that the two either write letters to one another or the witness serves as a mediator. She discussed incidents involving visitation schedules, doctor's appointments, therapist appointments, and activity schedules, where information was not relayed between the parties, and the petitioner's irrational and angry responses. Mrs. T. concluded that she would like Matthew to live with her family in West Islip where he could get the support a child needs.
The court also heard from Matthew's fourth, fifth, and sixth grade teachers: Sue F., Miguelina O., and Sandra G. All testified that both parents are very involved with Matthew's schooling. Both parents attended parent teacher meetings, conferences and assemblies. The petitioner attended a school trip to New York city three days before she gave birth to her second son. All of the witnesses observed a normal and loving relationship between Matthew and each of his parents. Ms. F. and Ms. O. were familiar with Linda T. who was obviously interested in Matthew's well being, but neither have ever met petitioner's current husband, Robert W. Ms. G., [*4]Matthew's current teacher, testified that Matthew was a happy and well rounded child who always came to the school prepared and well dressed.
The court also heard from Steven E., a coworker of the respondent and Teresa G., the respondent's sister. Mr. E. has known the respondent for ten years and met Matthew nine years ago. Mrs. G. has three sons and sees the respondent and Matthew at family gatherings. Both witnesses described the relationship between the respondent and Matthew as very involved with each other, like best friends. Both further described the relationship between Mrs. T. and Matthew as "excellent" , caring and loving. Finally, each described the relationship between Matthew and his step-brother Matt as playful and that they seemed to get along well.
The respondent testified that he has been employed by JRS Trucking as a delivery driver for seven years. He lives in West Islip with his wife Linda and her children from her first marriage, and Matthew. This is the respondent's third marriage. The respondent testified that he is very close with Linda's children, as is Matthew. The respondent also described his week with Matthew and the family and convincingly portrayed a close knit family unit. Further, as the other witnesses testified, the respondent described an extremely loving and close relationship with his son Matthew.
The respondent's testimony regarding the petitioner clearly showed a hostile and uncommunicative relationship that often put Matthew in the middle. The respondent testified to family vacation requests that the petitioner forgot, resulting in cancellations and very disappointed children. The respondent also testified to agreeing to switch visitation days with the petitioner in February of 2003, only to learn after the fact that she traveled to the Bahamas to marry her fiancé. According to the respondent, Matthew received a phone call from the petitioner and looked upset and teary eyed. When he hung up the phone, Matthew ran to his room and slammed the door shut. The respondent followed Matthew to his room and tried to console him. The respondent testified that he was very upset for Matthew, because Matthew should have been part of the petitioner's wedding. He stated that, unlike the petitioner, he took the time to speak to each child about his wedding and sought their opinion as to planning the event. It was important to the respondent that the entire family was part of his wedding.
The respondent testified as to his home and Matthew having his own room. Matthew would attend a middle school one mile away from the home. He further described where the library, local blockbuster, fire department and shopping was in relation to his home. He also testified to a large extended family in the area, the amount of time spent together, and the close relationships Matthew has developed with them all.
The respondent explained that Matthew suffered from a stroke at birth which caused paralysis in his right arm and leg. He has had several surgeries in an effort to lengthen his heel chord and hamstring in his right leg. Matthew wears an orthodic brace and has received physical and occupational therapy through school. The respondent testified that he has been an active part of Matthew's healing process and was present for consultations and the operations. Matthew currently has a brace in each home for convenience. The brace assists Matthew in walking and he wears it through the night. The respondent further testified to having investigated the schools in his district to ensure that they would be sufficient for Matthew's special needs without interfering with his schooling. However, during cross examination, the court learned that respondent's investigation was minimal and failed to establish that the West Islip school district [*5]offered any more services than the Three Village school district where Matthew currently attends.
According to the respondent, Matthew also suffers from a nervous stomach, or irritable bowel syndrome. In February of 2002, Matthew suffered from a bad stomach ache while visiting the respondent in West Islip. The respondent alleges to have attempted to contact the petitioner while she was on vacation in London, but was unable to and left a message. He took Matthew to a local pediatrician instead of driving fifty miles to the boy's regular doctor. The respondent testified that when the petitioner learned of the visit, she screamed and yelled at the respondent for not taking Matthew to his regular doctor. The respondent claimed that he tried to calm her down and explained that Matthew was hearing her rage. Ultimately, Matthew was instructed to eat smaller portions and more fiber. The respondent continues to take Matthew to his own pediatrician despite never having gotten written consent from the petitioner to do so. To the contrary, the petitioner testified that she first learned of the new pediatrician through the respondent's petition for custody in 2003.
The respondent also testified to the petitioner's move from Baldwin to Stony Brook in June of 2003. The respondent received an overnight letter from the petitioner on June 13, 2003, notifying him of the petitioner's new address, phone number and school effective three days later. The respondent waited for Matthew to come home to try to explain the situation to him. The petitioner phoned Matthew and told him of the move. The respondent described Matthew's look as "painful" and he was upset and cried. The respondent tried to reassure Matthew that all would be ok, but was very angry that this was how he and Matthew were to learn of an event that greatly impacted Matthew's life. The respondent testified that he had absolutely no knowledge of the move. The respondent further testified that Matthew now lives in an area where he has no family or friends. This was controverted by the petitioner, Mr. W., and Mr. A. who testified to there being numerous friends and relatives within a five mile radius of the Stony Brook home.
Due to the many changes that had occurred in Matthew's life, the respondent sought counseling for him in June of 2003. The therapist was one chosen by the respondent's wife, to whom she had been sending her children. The respondent did not inform the petitioner of the therapy until a month later. The petitioner was very angry and did not think Matthew was in need of therapy, which the respondent relayed to Matthew. The therapy was discontinued in July after the therapist spoke to the petitioner. Upon the Law Guardian's suggestion, therapy started again in January of 2004 with a therapist both parties agreed upon.
The respondent also testified to the birth of Matthew's younger brother. According to the respondent, he never had a conversation with the petitioner where she requested that Matthew be brought to the hospital. Instead, he tried to console Matthew after the petitioner scolded him for not making the request.
Finally, the respondent stated that he should be awarded custody of Matthew because he has dedicated his life to his son. He listens to him and considers Matthew's feelings before his own. Matthew needs his father. The respondent feels that if the petitioner is awarded custody, he will lose that closeness.
The court also heard from Robert W., petitioner's current husband. Mr. W. testified that he met the petitioner in December of 1997, began residing together in June of 1999, were engaged in August of 2002 and married in 2003. After several years of working out of state and commuting to New York for the weekends, Mr. W. took a job in New York in May of 2003.
[*6]
Mr. W. testified to having a very hostile relationship with the respondent. He testified to an incident on Matthew's birthday in May of 1998 when he had been dating the petitioner for approximately three months. The respondent would not allow Matthew to open any presents while Mr. W. was present. The respondent then packed everything up and left with the unopened gifts. Mr. W. also testified to an incident at Matthew's communion in May of 2000. According to Mr. W., the respondent arrived late and Mr. W., the petitioner and Matthew had already been seated. After the mass, the respondent confronted Mr. W. on the front steps of the church and angrily asked, "What gives you the right to sit with my son at his communion?" Mr. W. walked away to avoid a further scene. Another incident occurred in 2002 over the telephone. According to Mr. W., the respondent repeatedly called threatening and cursing at the witness, who hung up each time to avoid listening to the barrage of expletives. Finally, the respondent's wife called and Mr. W. explained that Matthew was at a friend's house.
As to the move to Stony Brook, Mr. W. explained that the contract for the home was signed in February of 2003, but due to a variety of problems the deal was very unstable. Matthew was driven by the house so he could see it. The family, including Matthew, packed the home during April and May. On June 9th, the witness received a call from his lawyer that the deal was on and the closing was within a few days. According to this witness, Matthew was told that night that it was finally happening. This testimony was supported by the petitioner's brother who testified to having had conversations with Matthew in April about the pool parties they can have at their new house. He also commented on his observations of the Baldwin home in May of 2003 and what a wreck it was with boxes everywhere.
Mr. W. testified regarding his wedding to the petitioner in the Bahamas in February 2003. According to Mr. W., both he and the petitioner were very disappointed Matthew was not there, but the respondent would not permit it. However, the two had a formal church wedding in August of 2003where Matthew was present and participated.
Finally, Mr. W. testified to Matthew's relationship with his brother. He described it as a great relationship where Matthew plays and helps feed his brother. This was also supported by the testimony of the petitioner, Mr. A. ,and Joanne A., petitioner's friend.
Mr. W. stated he has a great relationship with Matthew. This was also supported by the testimony of Ms. A. and the petitioner. The two have skied, boated, played video games, attended baseball games and parades together. Mr. W. drives Matthew to school and sometimes helps with his homework. As for parent-teacher conferences, Mr. W. said he attended one, but no others to avoid any altercations with the respondent. Mr. W. also agreed to attend parenting counseling if recommended by the court.
Finally, this court heard from the petitioner. Upon her separation from the respondent, the petitioner moved to a co-op in Valley Stream with then five year old Matthew. In August of 1998, she moved to East Rockaway for three years. In 2001 she bought a condo in Baldwin. Matthew was getting older and Robert W. had come into their lives, so a larger place was needed. The condo had a backyard and more room. The respondent had been notified of each of these moves by letter and never voiced an objection to any of them. This was in contrast to the respondent's move to West Islip which was made without ever notifying the petitioner. She learned of the move after the fact when mail she had sent to the respondent was returned to her.
The move to Stony Brook in June of 2003 was for the same reason, the family had [*7]outgrown the condo and the petitioner was expecting another child. Each child had a bedroom, and the neighborhood and school district were outstanding. The petitioner admitted to notifying the respondent by letter on June 11th, the morning of her closing, but denies not having discussed the move with Matthew. According to the petitioner, she first discussed the move with Matthew the prior Christmas. Matthew helped look at homes during the time period when the contract on the Stony Brook house was pending. She further testified that Matthew was in a "moving club" at school, consisting of friends who were moving as well.
As to the February wedding in the Bahamas, the petitioner testified that she first spoke to the respondent about it in December of 2002. The respondent was uncooperative and replied that he had made family plans. She asked again that Matthew be permitted to attend, but the respondent refused. The petitioner testified that she did not tell Matthew why he was not attending because she didn't want to hurt him. Instead she used the excuse that he could not miss any more school. However, Matthew was a full participant in the second wedding in August. He helped pick the invitations, picked out his own outfit and walked her down the aisle. The two danced together to their song, "You'll Always Be My Baby". The petitioner cried during this testimony.
The petitioner testified to a history of problems where the respondent ignored the agreed upon visitation as stated in the parties' stipulation of settlement. The stipulation states that the father is to have physical possession of Matthew on Christmas Eve from 4:00 p.m. to 12:00 a.m. Christmas Day. The mother is to have physical possession 12:00 a.m. Christmas Day to 7:00 p.m. Despite these terms, the respondent kept Matthew overnight on Christmas Eve in 1997, 1998 and 1999. In 2000, the petitioner called the respondent at 11:45 p.m. Christmas Eve to say she was on her way. The respondent argued with her that Matthew wanted to stay. He then told her "you'll need to come with the police because he is not leaving here". The respondent then put Matthew on the phone, who was upset and crying having heard the dispute. The petitioner asked Matthew if he wanted to stay and he said yes. To avoid any further problems, she agreed to pick him up the following morning. Another problem arose in 2003, where the respondent refused to return Matthew again as directed in the stipulation. Instead, the respondent dropped Matthew off on Christmas Day close to 10:30 a.m. The petitioner was very upset because this was Matthew's brother's first Christmas with the family and she wanted Matthew to be there from the beginning. No gifts were opened until Matthew arrived. Even then, the process had to be rushed because company was arriving shortly thereafter.
The petitioner agreed that there is very little communication between she and the respondent. Instead she speaks with Linda T. or communicates via letter since 2002. In fact, since Matthew was in the 4th grade the schools have provided separate parent-teacher conferences to avoid any problems that may arise between the two. In 1999, the two disagreed about the visitation schedule. She had made a statement that the proposed change would occur "over her dead body". According to the petitioner, the respondent replied "well if that's the way you want it, that's the way it will be"... "you better sleep with your lights on".. The respondent was absolutely enraged and screaming at her. He even made a reference to getting into her place by a side door and that he knew where she parked her car. The petitioner was terrified and called Mr. W. to tell him about the threat and ask if he were coming home because she didn't want to stay home alone. She then went to her mother's for the night. Mr. W. called later and told her he [*8]called the respondent. She asked Mr. W. not to call the police because she didn't want Matthew to see the respondent arrested. This testimony was supported by that of Mr. W. and Joan A., the petitioner's mother. The petitioner wept during this testimony.
The petitioner also provided a different version of events as to the birth of Matthew's brother. According to this witness, she called the respondent numerous times upon the birth of Matthew's brother to make arrangements for Matthew to come to the hospital to visit his new brother. The respondent told her he was not sure where Matthew was. On the following day she was told Matthew could not come to the hospital because he was having a birthday party. After another day of leaving messages, Linda T. finally called the petitioner and suggested that the petitioner pick Matthew up at 8:00 p.m. and return him by 10:00 p.m. The petitioner did not follow this suggestion as she had just given birth and was prohibited from driving. The petitioner was heartbroken that Matthew did not get to see his brother, because "that was a moment in time we can't ever get back". The petitioner denied ever telling Matthew she was upset that he didn't come to the hospital to see his brother. Again, the petitioner cried during this testimony.
The petitioner described her relationship with Matthew as extremely close and loving. She is a very involved parent in all aspects of Matthew's life. She described trips and activities that the family shared and enjoyed. She also testified to the emotional bond she had with Matthew, and that they would talk about everything. The petitioner even constructed her work week over the last four years to include at least two days at home, so she can be there more for Matthew.
As for punishing Matthew, the petitioner testified that she rarely has to do so because Matthew is a good child. The punishment usually consists of taking away Matthew's playstation video game. She admitted to having raised her voice to Matthew, but only using a stern voice telling him what he did wrong. The two always end it with a hug and kiss.
Finally, the petitioner testified that she should be awarded custody of Matthew because he has been the center of her life since the day he was born. She has always been his primary caretaker. She testified that she would be flexible with visitation with the respondent because it is important that he is in Matthew's life. The petitioner is afraid that she would be cut out of Matthew's life if custody were awarded to the respondent. The petitioner testified that she would be willing to participate in co-parenting courses with the respondent. Again, the petitioner cried during this testimony.
This court also heard expert testimony from Doctor "X", the court appointed clinical psychologist who specializes in forensic psychology. Dr. "X" described himself as an independent neutral evaluator whose purpose is to determine the best interest of Matthew through a series of individual and joint interviews. Dr. "X" also reviewed, conducted, and considered family interactions, collateral contacts, school and medical records ,and testing results of the adults and child.
Dr. "X" described the tests conducted and their results. Dr. "X" stated that the mother's results evidenced an emotional overreacting, histrionic. The father's results exhibited a narcissism. Matthew was described as insecure and tentative as to his self identity. When asked to draw his family, Matthew failed to include himself in his mother's. Dr. "X" explained this was "significant" and showed that Matthew was more comfortable with his father and unsure of his [*9]role within his mother's family. Dr. "X" also described the birth of Matthew's half brother as confusing to Matthew and that a competitive relationship had developed between the two. Dr. "X" further testified that interviews with Matthew revealed a close and warm relationship with his father and step-mother. To the contrary, Matthew seemed afraid to tell his mother certain things, always felt rushed and pushed by his mother. Matthew struggles to please both parents and struggles when he feels he is unable to do so. Dr. "X" also described the petitioner and her husband as less affectionate and communicative than the respondent and his wife. He further testified that Mrs. T. was obviously much more involved with Matthew's life than Mr. W. Finally, Dr. X concluded that it would be in Matthew's best interest to reside with his father as is Matthew's wish.
Despite his findings, Dr. X conceded to several relevant points on cross examination: he did not interview Matthew and his mother together to evaluate their emotional attachment; he never visited the mother's residence to observe the natural setting; he never observed Matthew with his younger brother to assess their relationship and how being a big brother may help build Matthew's confidence and self esteem; he never considered competition between Matthew and his step-brother; he discarded the notes and opinions of Matthew's therapist, Dr. E.; he did not note Matthew's reported positive feelings for Mr. W.; he did not investigate punishments by the respondent; he did not consider and report that Matthew's therapist felt that this stated desire to live with his father may not have been his own idea, but that of the respondent or suggested by the doctor himself during an interview.
Dr. X's report was further critiqued by Doctor "Y", a forensic expert in custody cases and forensic evaluations. Dr. Y stated that his opinion is relevant to the methodology and techniques used by Dr. X, not as to custody of Matthew. Dr. Y testified that Dr. X's report was "seriously flawed in a number of very basic ways" and failed to represent the state of the science. Instead, Dr. X's report reflected his own opinion. Dr. Y testified that Dr. X routinely misinterpreted and misrepresented aspects of the testing used in his evaluation. He never described the results and how he used same to determine custody. The report states that the tests indicated that Mr. T. was defensive, trying to avoid any negative criticism of himself. Yet, even with these efforts, Mr. T. tested as narcissistic, obsessive compulsive, lacking insight or awareness into emotional issues. Dr. Y testified that these results are never explained and do not support Dr. X's ultimate opinion that Matthew should reside with this kind of role model. Dr. Y explained that the psychological tests have never achieved acceptability for use in custody cases and have not been shown through any empirical study to be a reliable indicator, in any event.
Dr. Y further opined that Dr. X's finding that Matthew was in competition with his younger brother misrepresents the fact that most developmental psychologists agree that such sibling competition is normal. A newborn sibling is a universal phenomenon and should not be a basis for a custody change. There must be strong circumstances for anyone to separate biological siblings.
Further, Dr. Y also opined that Dr. X misused observational techniques. Dr. X reported that Matthew claimed to be emotionally closer to his father, but failed to support this with any data. According to Dr. Y, Dr. X further failed to observe the mother and child together to make such a comparison. Such an observation would also have allowed Dr. X to learn whether Matthew's self report was consistent with his behavior one on one with his mother. Dr. X notes [*10]flaws in the mother, but makes no showing that these flaws are representative of her behavior. As such, they should not become a basis of an opinion of the way the mother treats her son, especially without any observations of the two together. Further, Dr. X describes Matthew's relationship with Mr. W. as somewhat distant, but doesn't explain why and only observed the stepfather for an hour. Nor does Dr. X explain his description of Mr. W. as rigid or petitioner as emotionally reserved. Without further explanation and supporting data, these opinions are meaningless and should not be a basis for a change of custody.
Further, contrary to Dr. X's opinion, Dr. Y testified that the drawing by Matthew leaving himself out of his mother's family is insignificant. Dr. X never explored Matthew's feelings on the subject or the purpose behind the drawings. Instead, according to Dr. Y, Dr. X committed a self confirming bias, he had already formed a conclusion and used this data to confirm that conclusion.
Dr. Y also strongly criticized Dr. X's failure to discuss and bring to the court's attention that Matthew's motivation to live with his father may have had more than one layer to it. As a neutral evaluator it was his obligation to place all possibilities before the court. In Dr. Y's opinion, to disregard such is not maintaining the proper standard of neutrality.
DISCUSSION
Matthew is at a stage in his life where he needs love, stability, and guidance. The acrimony between these parents has escalated to a point where it appears to interfere with Matthew's best interests. This court can not permit this pattern to continue and must make every effort to pursue the best interests of Matthew.
It is clear to this court that both the petitioner and the respondent deeply love Matthew, but are completely unable to communicate with one another. The parties must learn to communicate in a fashion keeping in mind Matthew's best interests. It appears that letter writing is the most reasonable way for these parties to communicate, since they are obviously unable to speak to one another in a civilized fashion. Although these parties have exercised this way of communicating, they have done so sporadically and disrespectfully. The respondent has moved his residence without any notification to the petitioner; and the petitioner has moved her and Matthew's residence with only two days notice to the respondent. This kind of disrespect for one another must stop, because in the end it is Matthew that is affected. The parties must be more diligent with their efforts to inform one another of any change that may concern Matthew, and must do so with enough time for the other parent to express any opinions on the matter. Less conflict between the parents will not only benefit their relationship, but will certainly benefit each of their relationships with Matthew.
Although this court did not hear directly from Matthew because Dr. X advised, and the Law Guardian concurred, that such would be detrimental, the evidence presented from both sides throughout this trial made it clear that Matthew is a happy, bright, and delightful child who is very close to both of his parents. This court is not convinced that Matthew is closer to his father than his mother, or fearful of his mother and afraid to express himself to her. It is clear to this court that each party has a different parenting style which elicits different responses from Matthew. However, the love and respect Matthew has for one parent equals that for the other. This is what makes this court's decision difficult, for each party is a good parent to Matthew. [*11]However, a decision must be made as each party is seeking sole custody of the child.
Through the evidence presented, it is clear that Matthew wishes the current situation to remain the same, for he loves both his parents and does not want to chose between them and does not want to let either of them down. In an effort to grant Matthew's wishes, which this court firmly believes would be in his best interests, petitioner is hereby awarded custody of Matthew. This will avoid another move for Matthew and another school for Matthew.
Further, this court deems it important that Matthew will continue to reside with his only biological sibling.. This court can find no "overwhelming need" to separate the two.
Finally, the evidence presented throughout this trial shows less of an effort on the respondent's behalf to maintain and encourage the relationship between the petitioner and Matthew. The respondent's disregard for the mother's input regarding Matthew's therapy and doctor appointments, his disregard for the stipulated holiday visitation schedule, his disregard for the mother's requests to have Matthew present at her first wedding and at the birth of his only biological brother, is a great concern for this court. It appears to this court that the respondent has been inflexible with his schedule more to spite the petitioner than in the best interests of Matthew. The petitioner has allowed the respondent to get away with this selfish behavior so as to keep the peace for Matthew's sake. To the contrary, the petitioner has invited the respondent and his family to birthday parties etc...in an effort to be sure he is a part of Matthew's life. However, this court notes that even the mother's efforts have broken down over the last couple of years as evidenced by her notifying the respondent of the move to Stony Brook only days before the actual move. This tit for tat behavior does not benefit Matthew and this court hopes that a final resolution of custody will bring it to an end.
This court respects the respondent's bond with his son, and directs that the respondent be granted as much visitation as possible, without interfering with Matthew's activities and schooling, to maintain the relationship between the two. This Court directs that there be a visitation schedule of alternate weekends and two nights during the week. The parties' shall equally share holidays and school recesses. The father shall be granted four weeks in the summer, no more than two consecutive weeks at a time, to be arranged between the parties by May 1st of each year upon written notice.
These parents must remember, they are forever bound to one another through their son who needs and loves them both. This Court further directs that these parties receive co-parenting counseling in an effort to learn how to relate to one another for the benefit of Matthew. The discord must come to an end and Matthew can not be placed in the middle. He is a sensitive child who deserves a loving and healthy relationship with both of his parents.
This court recognizes that its decision is not in accordance with the recommendation of the court appointed forensic psychologist. In light of the totality of the evidence presented during this trial including cross examination of Dr. X and the testimony of Dr. Y, this Court cannot rely on the scientific validity of the reasoning of the expert, nor agree with his ultimate conclusion. "Relying on experts without testing the reliability of their methods and procedures cloaks experts' value judgments under the veil of science and risks that their personal and professional characteristics bias the evaluation and the importance of information learned" (Shuman, D.W., "The Role of Mental health Experts in Custody Decisions: Science, Psychological Tests, And Clinical Judgment," 36 Fam. L.Q. 135 (Spring, 2002)). A Court is [*12]obliged to hold the mental health witness accountable for the application of empirically supportable principals and methods and to insist that the experts whose opinions can change lives support each and every one of their inferences with specific empirical evidence. The Court must demand that the expert's reasoning is scientifically valid (See, Empirical and Ethical Problems with Custody Recommendations: A Call for Clinical Humility and Judicial Vigilance, Tippins and Wittman, p. 38-39). Here, with substantial individual rights hanging in the balance, it clearly becomes the responsibility of this court to keep unscientific opinions out of the process entirely. The best interest standard is a legal and socio-moral construct, not a psychological construct.
This is the decision and order of the court. The petitioner shall submit an order of custody and visitation in compliance with the above within thirty days of receipt of this order.
ENTER
Dated: July 19, 2004_________________________
 ETTORE A. SIMEONE
 J.F.C.
SO ORDERED: