*723 OPINION OF THE COURT
Sandra B. Edlitz, J.
The parents in this custody proceeding have had a long, tortured history in the courts regarding custody and visitation issues, heard before numerous Judges over the course of a decade. The animosity that the mother, the physical “custodial” parent,[1] has long harbored for the father has not lessened with time. As predicted by the mental health professionals at the inception of these matters, the mother has succeeded in causing parental alienation[2] of the children from their father, such that they wish no longer to have frequent and regular visitation or anything much else to do with him. Given this parental interference, the issue before this court is whether it is in the best interests of the subject children, now 11 and 13 years of age, to modify the custody order and to grant the father sole custody. Ultimately, with much deliberation, this court has determined that the long-term emotional best interests of these children mandate a change of custody to the father.
*724 BACKGROUND HISTORY
The parties were married. There are two children of the marriage, J. F., born on May 26, 1986, and C. F., born on March 8, 1988. In or around July 22, 1990, the parties separated. The Westchester County Supreme Court granted the father an order of visitation entered on April 5, 1991 in which the father was granted unsupervised visitation with the children, with the police to assist in “procuring” this visitation for the father. The parties’ divorce action was tried before a Judicial Hearing Officer who rendered a decision dated January 21, 1993 providing, in part, for custody of the children “to continue” with their mother. The judgment of divorce was filed on October 3, 1994, and granted the mother sole custody. An order, on consent, was entered on October 16, 1995, which provided, inter alia, that the parties shall have joint custody, with primary physical residence with the mother, and for a visitation schedule for the father. The following wording of that order is the subject of this proceeding: “should any further parental interference with the rights of the other parent be demonstrated to the satisfaction of this court, the court after a hearing shall use its power to terminate the joint-custody arrangement and award sole custody to one party under the appropriate circumstances and to incarcerate a parent for any willful interference.” (Emphasis added.)
THE SUBJECT PETITIONS
On August 13, 1998, the petitioner father, by order to show cause against respondent mother, applied for an order transferring custody to him, directing that the children be evaluated by Dr. Daniel Feinberg (a psychiatrist who was appointed by the Supreme Court in the parties’ divorce action and who testified before the Family Court in 1995), holding the mother in contempt of this court’s order entered on October 16, 1995, suspending child support payments, and for other relief. Annexed to the order to show cause is an affidavit of the psychiatrist, Dr. Daniel Feinberg. In his affidavit, Dr. Feinberg recommended a change of custody to the father. An affidavit of the father, along with an extensive exhibit, provided a summary of the mother’s alleged willful interference with visitation, and examples of ways in which the mother allegedly alienated the children from their father during the years 1996, 1997 and 1998.
The court conducted a continued hearing over the course of 15 days. The court conducted in camera interviews of both chil *725 dren on March 26, 1999, and of C. F. on June 1, 1999. The court withheld rendering a decision until June 25, 1999 when the school term was over for the children, with the consent of the parties, and in their best interests, so as not to disrupt their lives any more than is necessary. Both parties were represented by counsel. The Law Guardian, who represented the children during the parties’ divorce action, and thereafter, in all Family Court proceedings, again represented them.
The court had an opportunity to observe the children closely during the extensive in camera interviews. They are both highly intelligent and articulate and, in many ways, engaging and charming. They also show a resilience and ability to adapt to situations. Yet, particularly when discussing their father and his family, they present themselves at times in a surreal way with a pseudo-maturity which is unnatural and, even, strange. They seem like “little adults.” This court finds that they live a somewhat sheltered, cloistered existence with their mother, emotionally and socially. They do not have friends to their home on a regular basis, and they do not go to other children’s homes with any frequency. They do not have friends in their mother’s neighborhood.
The loving way in which the children perceive their mother, and the way in which they uncritically describe her as being perfect, stands in stark contrast to their descriptions of their father. Their opinions about their father are unrealistic, misshapen and cruel. They speak about and to him in a way which seems, at times, to be malicious in its quality. Nothing in the father’s behavior warranted that treatment. The psychiatrists testified that the children are aligned in an unhealthy manner with the mother and her family. This is evidenced not only in the testimony of the father but also in the in camera interview. They repeatedly refer to the mother’s family as “my family,” but they do not refer to the father or his family that way. Both children used identical language in dismissing the happy times they spent with their father as evidenced in the videotape and picture album as “Kodak moments.” They deny anything positive in their relationship with their father to an unnatural extreme.
The court carefully considered all of the testimony, the in camera interviews, the current forensic reports and the voluminous exhibits entered into evidence. This evidence included two videotapes, one from 1994 which involved the children speaking with their father’s now current wife about alleged mistreatment at the hands of their mother, and one *726 which is representative, allegedly, of the visits over the years of the children with their father. Petitioner entered into evidence a photograph album of pictures of the children with their father.
FORENSIC REPORTS AND TESTIMONY
This court is convinced that the subject children have been alienated from their father by their mother. Their negative view of their father is out of all proportion to reality. The children, by their conduct, have demonstrated that they do not wish to visit with their father. The predictions of the mental health evaluators have unfortunately come true. All three of the experts agree that the children have been alienated from their father by their mother.
Dr. Herbert Lessow, a Board-certified psychiatrist (not a child psychiatrist), has served as the independent court psychiatrist in this matter at least since 1994, again in 1995, and for the instant proceeding. In 1994 and 1995 Dr. Lessow recommended a change in custody to the father.
In connection with this proceeding, pursuant to order of this court, Dr. Lessow conducted psychiatric evaluations of the parents and children and submitted reports dated October 16, 1998 and January 21, 1999. In his preliminary report dated October 16, 1998, and in his testimony, he reported that the father has no evidence of any psychiatric disorder in the area of “thinking, affect, or behavior.” He did not find evidence that the father had attempted to alienate the children from their mother, and he testified that the father had “insight.” He further reported that the mother continued to have a DSM IV psychiatric diagnosis of “moderate-to-severe Personality Disorder, NOS, with Borderline, Obsessive, and Passive-Aggressive features. The possibility of paranoid traits may still be entertained.” With regard to the mother, he stated that “the issues that were present * * * have clearly continued and are probably even more severe in regards to Parental Alienation of the children from their natural father.” He stated, in part, that “[M] other has clearly won the war over the children’s minds and hearts and the father is generally helpless to offset that. Children, likewise, are deeply attached in a symbiotic fashion with their mother * * * Father is painted in a highly derogatory and negative fashion, way out of proportion to any possible deficiencies that he may have. This is clearly a borderline mental device within the mother’s psychology which has been clearly duplicated in the children. The overall prognosis for any *727 major change in their attitude would appear to be quite limited at this time, even with expert psychiatric assistance.” (Emphasis added.) Dr. Lessow did not recommend a change in custody in that he was concerned about the near term and intermediate effect on both children, but he remained “extremely concerned” about the over-all prognosis with either decision.
The court-appointed psychologist, Melvin Sinowitz, Ph D, concluded in his reports dated December 1, 1998, that the Parental Alienation Syndrome is “clear” and “definite” with both children. He found that if C. F. is separated from the mother, she will become “increasingly anxious, she will be depressed, and her oppositionalism will become her mode of dealing with her difficulties.” Dr. Sinowitz did not see her as decompensating more than he suggested, and he did not fear that she would become psychotic. As to J. F., Dr. Sinowitz concluded that, as with his sister, the reality deficits are circumscribed and encapsulated around the “Parental Alienation Syndrome.” If he is removed from his mother’s home, the doctor did not believe that he will decompensate, and that it is more likely that he will become more paranoid, and that he will begin to “act out.”
Dr. Feinberg, petitioner’s expert, submitted a report to the court dated December 18, 1998. He is a diplómate in psychiatry and neurology, a member of the American Academy of Psychiatry and the Law, and a diplómate of the American College of Forensic Examiners. He has a subspecialty in child and adolescent psychiatry. He was assigned to do a court evaluation in this case in 1991, and he testified for the father in 1995 at the prior custody hearing. He recommended custody to the father at that time. He participated in preparing an affidavit which was annexed to the father’s order to show cause in this proceeding. In his conclusions and recommendations, he stated: “As predicted in my lengthy testimony in 1994, the alienation from the father has become more severe, probably the most severe case of alienation I have personally witnessed in my 33 years of doing child psychiatry. All of the classic signs of Alienation Syndrome are there and have been in place at least since 1991. If the children are allowed to remain with their mother, their paranoia will harden into pathological personality traits as so clearly seen in their mother and her extended family. If the children are placed in their father’s custody at this time, emotional upset and some possible turmoil in the short term may occur. This will require competent professional intervention. I have conveyed that to Mr. and Mrs. F. and they are prepared and *728 well motivated to carry through with that psychiatric treatment.” (Emphasis added.)
OTHER TESTIMONY
The father testified at great length, both on his own behalf, and as respondent’s witness, about the ways in which the mother had allegedly interfered with his relationship with the children.[3] The mother did not testify, but attempted, through her attorney, to show that she had not contributed in any way to the children’s view of their father, that she had encouraged them to have a good relationship with their father, that she did not interfere with their relationship with the father, and that it was the father’s lack of concern, inattention, insensitivity and poor parenting that resulted in the current position of the children.
APPLICABLE LAW
The general rules regarding a change of custody have been long established in New York: “[w]ith respect to any determination as to a change of custody, the paramount consideration must be the best interests of the children (see, Eschbach v Eschbach, supra; Friederwitzer v Friederwitzer, 55 NY2d 89; Keating v Keating, 147 AD2d 675). Among the factors to be considered are the quality of the home environment and the parental guidance the custodial parent provides for the child (see, Eschbach v Eschbach, supra, at 172; Matter of Ebert v Ebert, 38 NY2d 700, 702), the ability of each parent to provide for the child’s emotional and intellectual development (see, Porges v Porges, 63 AD2d 712, 713), the financial status and ability of each parent to provide for the child (see, Eschbach v Eschbach, supra), the relative fitness of the respective parents, and the length of time the present custody arrangement has been in effect (see, Matter of Nehra v Uhlar, 43 NY2d 242).” (Matter of Krebsbach v Gallagher, 181 AD2d 363, 364-365, lv *729 denied 81 NY2d 701.) (Note that in Kresbach, the Appellate Division, Second Department, specifically stated that the treating therapist testified that he saw no signs of “parental alienation syndrome”, and that he testified that there was no plot or plan to alienate the children from their father [supra, at 367].)
Another proper and relevant consideration is “the effect that an award of custody to one parent might have on the child’s relationship with the other parent.” (Bliss v Ach, 56 NY2d 995, 998; Young v Young, 212 AD2d 114, 118.) With regard to the father’s right of visitation herein, the custodial parent has a duty to protect and to nurture the child’s relationship with the noncustodial parent, and to ensure access by the noncustodial parent. (Daghir v Daghir, 82 AD2d 191, affd 56 NY2d 938.) This court recognizes that in the instant case, the parents have joint custody, and therefore neither party is the sole custodial parent. However, even though there is a difference in nomenclature, it is submitted that the principles in these cases apply herein. The Appellate Division, Second Department, has stated that “ ‘[t]he natural right of visitation jointly enjoyed by the noncustodial parent and the child is more precious than any property right’ (Resnick v Zoldan, 134 AD2d 246, 247) and that ‘the best interests of the child would be furthered by the child being nurtured and guided by both of the natural parents’ (Bostinto v Bostinto, 207 AD2d 471, 472). Indeed, a custodial parent’s interference with the relationship between a child and a noncustodial parent has been said to be ‘an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent’ (Maloney v Maloney, 208 AD2d 603, 603-604).” (Young v Young, 212 AD2d 114, 115; see also, Entwistle v Entwistle, 61 AD2d 380, 384-385, appeal dismissed 44 NY2d 851; Leistner v Leistner, 137 AD2d 499, 500.)
As in Young {supra), in this case the mother’s interference with the relationship between the children and the father is not an outright denial of visitation by making the children physically unavailable at the appointed time. Rather, the mother’s interference here “involves a more subtle and insidious form of interference, a form of interference which, in many respects, has the potential for greater and more permanent damage to the emotional psyche of a young child than other forms of interference; namely, the psychological poisoning of a young person’s mind to turn him or her away from the noncustodial parent.” (Young v Young, 212 AD2d 114, 115; see also, Matter of Gago v Acevedo, 214 AD2d 565, 566, lv denied *730 86 NY2d 706 [which combined many types of interference with visitation, in which the Appellate Division, Second Department, gave custody to the father, where the mother “persistently interfered with the father’s visitation rights by making unfounded allegations of child abuse against the father, by coaching the child to make false allegations of abuse, and by causing disruption to the child’s visitation and vacation plans with his father.”].)
In the instant matter, as in Young (supra, at 115), if the children were to be left with the mother “the children would have no relationship with their father given the mother’s constant and consistent single-minded teaching of the children that their father is dangerous. She has demonstrated that she is unable and unwilling to support the father’s visitation.” Custody was changed to the father in Young. (See also, other Appellate Division, Second Department, cases in which the custodial parent interfered with the noncustodial parent’s right to visitation, which conduct led the Court to change custody: Matter of Muller v Muller, 221 AD2d 635, 636; Matter of Carl J. B. v Dorothy T., 186 AD2d 736; Matter of Sandra C. v Christian D., 244 AD2d 551; Matter of Notley v Schmeid, 220 AD2d 509.)
In the instant case, the children do not want to visit with their father. With the passage of time, these children have become “staunch corroborators” of their mother’s ill opinion of the father. They call their father names, they make fun of his personal appearance, they treat him as though he were incompetent, and they speak of and treat his wife similarly.[4] Yet the research on the effects of separation and divorce, as reflected in the case law, indicates that children are healthier when they maintain a close relationship with both parents, and that the loss of one parent is detrimental to the child. (See, Young v Young, 212 AD2d 114, 115, supra.) Even though the children have expressed a preference for living with their mother, while it is a factor to be considered, it is not determinative. (See, Young v Young, 212 AD2d 114, 123, citing Darema-Rogers v Rogers, 199 AD2d 456; Zucker v Zucker, 187 AD2d 507.)
The children in this case have always resided with the mother. This court is mindful that although stability is an *731 important consideration and has been found to be in children’s best interests, it cannot be the decisive factor. “ ‘That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are disruptive’ (Matter of Nehra v Uhlar, supra, at 248).” (Young v Young, supra, at 124.) In this case, the children’s emotional stability will benefit from a change of custody, despite the fact that they have always resided with their mother.
The Law Guardian recommended that custody remain with the mother based solely on the stated positions of her clients. The Law Guardian was not making a recommendation based on the best interests of the children, which she conceded. With respect to the weight to be afforded the recommendations of court-appointed experts, the Appellate Division, Second Department, has stated that the court is not required to follow the recommendations of the court-appointed experts. (Matter of Hopkins v Wilkerson, 255 AD2d 319.)
FINDINGS AND DECISION
The court, after a review of all of the evidence, and being in the unique position to observe the demeanor and credibility of the witnesses, cannot accept the mother’s position in this matter. The mother’s view of the father has been completely adopted by the children and she has done nothing to promote their relationship with him. After having done the damage, she cannot now sit back and pretend that none of this is of her making. Neither parent communicates effectively with the other. If they did, these involved and constant proceedings before the court would not have been necessary. The father has continued to keep fighting to have access to his children over the years, despite the clear attempts on the part of the mother to undermine his relationship with them. The court recognizes that the father is not without faults. However, it is this court’s belief that with therapeutic assistance, any issues of parenting will be addressed.
This court is faced with unanimous conclusions on the part of the three forensic evaluators, Dr. Lessow, Dr. Sinowitz and Dr. Feinberg, as well as the stated view of the Law Guardian, that these children have been alienated from their father by their mother. Where the opinions diverge is whether or not to change custody. This court accepts and adopts the reports and testimony of the mental health professionals to the extent that they indicate that the mother alienated the children from the father. She psychologically poisoned their minds, despite her *732 love for and devotion to them. The court finds that the children will have no relationship with the father if left in the custody of their mother. The court finds, further, that they will continue to be psychologically damaged if they remain living with the mother. She is apparently unwilling or unable to control her behaviors.
The court has struggled mightily with this decision, balancing the short-term consequences to the children of a change of custody, including foreseeable emotional upset and possible trauma, against the long-term consequences of allowing physical custody to remain with the mother, which likely will result in the children having pathological personality traits which would interfere with their ability to establish whole relationships not only with their father but also with peers, future spouses or significant others, with extended family members, with employers and co-workers, and with the risk of their passing down a jaundiced and paranoid view of life to their own children. The mother has “poisoned” their childhood. The poison must be purged to restore them to a healthy state. This court seeks to restore normalcy to their lives and give them a chance to have a better childhood and a healthy adolescence and adulthood.
Thus, in light of the totality of the circumstances, the court has concluded that the best interests of these children are served by awarding custody to the father. The court acts with a weighty awareness of the gravity of its decision. The court has considered at length less drastic approaches, such as granting the father summer visitation and ordering immediate therapy for the children and parties. The court has concluded that such remedies would be ineffective. Although the children may be upset, angry and disappointed and may grieve, the court has faith that in the long run, the children’s resiliency, lust for life and underlying goodness and purity will bring them to a place where they can love and be loved by both parents. To this end,, the court directs that the children be in therapy with an appropriate therapist with experience in parental alienation and that the parents cooperate in such therapy. While it is only precatory, the court urges the stepmother to participate in such therapy to the extent recommended by the therapist.
This court ordered, inter alia, that sole custody of the parties’ two children be transferred to the father, that the mother’s contact with the children be suspended until otherwise recommended by the children’s therapist, that the father expedí *733 tiously enroll the children in therapy with a therapist familiar with and experienced in treating cases involving parental interference or alienation, the choice of such therapist to be approved by the Law Guardian, that the parties cooperate with the children’s therapy and participate in such therapy to the extent recommended by the therapist and that both parties participate in their own individual therapy, if recommended, that the Law Guardian shall provide reports to the court regarding the children, and that the father’s motion to hold the mother in contempt be denied.

. The parties have joint custody, and the mother has physical custody, pursuant to a Family Court order entered on October 16, 1995 (Braslow, J.).

. Both expert witnesses testified that the Parental Alienation Syndrome (PAS) exists in this case. The psychologist who evaluated the children and provided a written report to the court found that PAS was “clear” and “definite” with both children. Parental Alienation Syndrome occurs when “one parent uses his/her influence with his/her child to undermine the relationship between the child and the other parent. It typically arises when the parents are engaged in divorce proceedings or a custody dispute.” (See, People v Loomis, 172 Misc 2d 265, 267.) The Parental Alienation Syndrome theory was developed by Dr. Richard Gardner, and is described by him as a disturbance in which “children are not merely systematically and consciously ‘brainwashed’ but are also subconsciously and unconsciously ‘programmed’ by one parent against the other.” (Note, The Parental Alienation Syndrome: A Dangerous Aura of Reliability, 27 Loy LA L Rev 1367, 1370 [June 1994], quoting Gardner, The Parental Alienation Syndrome: A Guide For Mental Health and Legal Professionals [1992]; see also, Note, Parental Alienation Is Open Heart Surgery: It Needs More than a Band-Aid To Fix It, 34 Cal W L Rev 567 [1998].) The theory is controversial. According to the testimony of Dr. Lessow, the syndrome is not approved as a term by the American Psychiatric Society, and it is not in the DSM IV as a psychiatric diagnosis. Generally the New York courts, in the context of a custody/visitation case, rather than discussing the acceptability of PAS as a theory, have discussed the issue in terms of whether the child has been programmed to disfavor the noncustodial parent, thus warranting a change in custody. (Borris, Interference With Parental Rights of Noncustodial Parent As Grounds For Modification Of Child Custody, 8 Divorce Litig [No. 1] 1, 9 [1997], citing Matter of Karen B. v Clyde M., 151 Misc 2d 794, affd sub nom. Matter of Karen PP. v Clyde QQ., 197 AD2d 753.)

. Some of the alleged examples were the father’s testimony that the mother interfered with his summer vacations in 1996 and 1998, that the mother told the children that petitioner was “disowning them” by requesting a religious annulment from her, that the mother did not allow the father a chance to talk to C. at her communion in the spring of 1997, that she discussed financial issues in front of the children, that she made the children return to their father’s home mementoes of trips and presents that the father gave to them, that the mother sent the children with inappropriate clothing to the father’s home, that the mother put the fear of going to Portugal in the children’s heads and did nothing about the children’s behavior towards him in May of 1998.

. See, Walden v Walden, 112 AD2d 1035, 1037; see also, R.B. v S.B., NYLJ, Mar. 31, 1999, at 29, col 5, in which the Supreme Court, New York County, in the context of a matrimonial action, reduced spousal support on the basis that the wife had “so vilified” her husband to her son that the boy had refused to see his father for nearly four years.