Lisa B. v Salim G. (2005 NY Slip Op 50561(U))

[*1]

Lisa B. v Salim G.

2005 NY Slip Op 50561(U)

Decided on April 13, 2005

Family Court, Suffolk County

Simeone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 13, 2005

Family Court, Suffolk County
LISA B., Petitioner(s),
against
SALIM G., Respondent(s).
V-17998-04

Ettore Simeone, J.
PROCEDURAL HISTORY
Petitioner, Lisa Ann B. was granted custody of the parties two children, Kenan G., and Kerim G., in accordance with a Supreme Court Judgment of divorce dated July 9, 2003. Respondent, Salim G., was granted liberal visitation rights therein, with a schedule of specific visitation set forth. On October 7, 2004, petitioner, filed a petition for a Writ of Habeas Corpus seeking the return of the parties two children after respondent refused to return them to petitioner's custody following visitation. On October 8, 2004, respondent filed a petition for modification of the order of custody, alleging various incidents including the physical abuse of the children by petitioner's "live-in boyfriend", as well as petitioner's intention to relocate.
On October 12, 2004, the parties appeared in Court on the Writ of Habeas Corpus and the Court ordered that the children be returned to petitioner. The Court also issued a temporary order of protection directing petitioner to refrain from harmful acts against the children and prohibited petitioner from allowing her boyfriend "Beat M.", from having any contact with the children.
On October 25, 2004, petitioner filed an application seeking the Court's permission to relocate with the children to Arizona. Petitioner alleges in her petition that the children are "extremely upset" after their visits with respondent; respondent threatens to take the children to Turkey to live; respondent has made false allegations against petitioner and her boyfriend which were deemed unfounded; respondent was convicted of third degree assault against petitioner and her daughter; respondent has been extremely physically abusive to petitioner; respondent is attempting to alienate the children from petitioner; economic hardship necessitates relocation and would provide a more stable environment for the children.
[*2]
Thereafter, on November 1, 2004, Jane Bernstein, law guardian appointed for the two subject children, filed an petition requesting an Order requiring that respondent's visitation be supervised. The law guardian alleged in her petition that CPS concluded that reports of physical abuse against the children by "Beat M." were "unfounded"; that "the father's continued attempts to unduly influence the boys to lie are endangering the children's emotional well being and growth"; and that "on October 26, 2004, that father told the boys he was going to take them to Turkey and put them in school there whether they liked it or not."
On December 2, 2004, the Court vacated the order of protection issued against petitioner.
FACT FINDING
The Court commenced a fact-finding hearing on the aforementioned petitions on November 4, 2004. Maria Migliore, a social worker, testified that she met with Kenan and Kerim, the subject children, individually the week before and that Kenan told her he previously lied to a C.P.S. worker about his mother's boyfriend (Beat M., hereinafter referred to as "Mr. M.") hitting him. Ms. Migliore stated that Kenan said that his father pressured him to lie because he told him he would take him to Turkey and that he would not see his mother again. Ms. Migliore also stated that Kenan told her that he loves his father.
Ms. Migliore testified that the younger child, Kerim, told her that he accidentally hurt his lip when holding onto Mr. M.'s leg, but that his father told him to say that he was hit. The witness reported that Kerim told her that he felt badly about this, but that he was pressured by his father and afraid that his father would go to Turkey and that he would never see him again. Kerim indicated to the witness that he missed Mr. M. and wished he would come back home. Ms. Migliore stated that both children indicated that they wanted to move to Arizona and while they would want to visit their father in Turkey, they did not wish to live there.
Rosemarie Carlson, of Child Protective Services testified that she interviewed both children individually and that the allegations against Mr. M. and his physical abuse of the children were determined to be "unfounded".
Dr. N., PhD, psychology, testified that he began seeing Kenan in May of 2002, due to the child experiencing difficulty in school, lying about homework, and becoming physically aggressive. Dr. N. indicated that teachers have expressed concern about Kenan's ability to concentrate, but that up until a month ago Kenan was making "progress". Kenan has been taking "Concerta" since November of 2002, but does not take it during the summer.
Dr. N. also testified that Kenan told him that he witnessed his father hit his mother and while the child said that he wasn't afraid that his father would hurt him, he was afraid that his father would hurt his mother. Dr. N. stated that Kenan has referred to his mother as a "stupid American", "hooker" and "low life" when angry with her and that he got these terms from his father.
Additionally, Dr. N. indicated that he met with Kenan in October of 2004 on the date of the alleged abuse by Mr. M., but that Kenan never mentioned it. Dr. N. stated that he learned of the alleged incident later when Kenan's mother called to let him know what had happened. Dr. N. testified that Kenan subsequently told him that he lied to police about the alleged abuse by Mr. M. and that he was very upset that Mr. M. was removed from the house.
[*3]
Dr. N. stated that Kenan repeatedly expressed being "afraid" or "worried" that his father was going to take him to Turkey away from his mother if he didn't do certain things. Dr. N. reported that the last time he saw Kenan on November 2, 2004, he was particularly anxious because his father told him that he was going to take him to Turkey and put him in school there. Dr. N. stated that Kenan would appear more agitated at the beginning of the school year or if "things happened" on visitation.
Dr. N. stated that Kenan's mother or Mr. M. brings him to therapy and characterized the boys relationship with Mr. M. as "positive". Dr. N. explained that he has never contacted the boys' father because he felt that the father might try to undermine the therapy.
Neil K, the social worker from the Longwood School District testified that Kenan is currently in the middle school but that he met him approximately four years ago when he was in elementary school. He saw Kenan approximately two times a month and last saw him in May or June of 2004 and even though their meetings were not mandated, Mr. K stated that Kenan would "seek him out". He described his relationship with Kenan as a "positive" one, characterizing Kenan as "polite", "engaging" and "verbal". Mr. K stated that Kenan has become more withdrawn, belligerant and oppositional over the past year and a half.
Further, Mr. K reported that Kenan expressed "anxiety" over the difficulties between his parents and that while Kenan never said that he witnessed any domestic violence, he did indicate that he heard his father "threaten" his mother. Kenan has made negative comments about his mother, referring to her as "a silly woman" and that "all she does is cry." Kenan has shown more resistance to talking about his father and has expressed fear that his father would be angry, go to Turkey and never see him again.
Mr. K indicated that he spoke to petitioner about once a month, but has never contacted or been contacted by respondent. Petitioner also admitted that she never informed respondent that Kenan was seeing Mr. K or Dr. N., because she claims that respondent doesn't believe in therapists and that he has told her son "therapists make you hurt your father". Mr. K testified that he wrote a letter at the request of petitioner which states:
"I worked extensively with Kenan as a non mandated counseling student. Kenan presented as a mildly distractable boy who was experiencing conflict with regard to his parents separation. He would describe being anxious and worried over his dad's verbal and emotional reactions during visitations. Kenan indicated repeatedly and consistently that his dad had questioned and pressured him about his mother. At times, Kenan would say that his father threatened to go back to Turkey and that Kenan would never see his dad again. These threats were the result of Kenan's unwillingness to talk about his mother with his father. Kenan has shared with me that his father routinely would say harsh and inappropriate comments about his mother. Kenan appeared fearful of his father's reactions. Kenan described his father's behavior towards his mom as scary.... I have met with and worked with Kenan's mother, Lisa B. and her fiancé, Beat M.. I have found them both to be exceptional parents (substitute parent) They have showed tremendous love and interest for the well being of both Kenan and Karim. Mr. M. seems to have provided a warm, stable, emotionally consistent male influence." (Respondent's exhibit "B")
[*4]
Anne Marie G., respondent's sister-in-law, testified that she is married to respondent's brother and that she has been close to respondent for eighteen years. She indicated that she has picked up and dropped off the children for visitation with respondent because he doesn't drive. Mrs. G. stated that she is present for visitations and that the children are very upset when they have to leave, but that respondent tells them that they have to go home. She also stated that she has never heard respondent ask the children about their mother, disparage her, or tell them that he is taking them to Turkey. Further, Mrs. G. states that respondent is never disrespectful to women nor does he make "anti-woman" or "anti-American" comments.
 Mrs. G. testified as to an incident in which she picked up the children for visitation and the children told respondent that Mr. M. hit them. Mrs. G. testified that Kerim had a cut on his lip and Kenan had bruises on his leg and thigh. The witness stated that no medical attention was sought because the doctor's office was closed and the injuries were not severe enough to go to the emergency room. The witness further indicated that they took photographs of the children's injuries (Respondent's exhibit "A" 1-6), called the police and an incident report was filed. Mrs. G. claimed that after this, the children "begged not to go home" because they were scared.
Mrs. G. testified that when she appeared in Court on October 12, 2004, the children cried and said "please don't let us go home to Mom, we don't want to see Beat". Mrs. G. indicated that she has not had contact with the boys in the last four months.
Selma G., respondent's wife, testified that she and respondent married in Turkey in July of 2003, and in September of 2003, she came to live with him here. She testified that respondent is close with his children and that the children are affectionate with her and their father. Mrs. G. stated that she spends time with Kerim and Keenan and that she is able to speak in Turkish with the boys, but plans to learn English. Mrs. G. states that if respondent was awarded custody of the children she would welcome them into their home. She denied having argued with respondent in the presence of the boys.
Respondent testified that at the time he married petitioner in May of 1991, petitioner had two other children from a prior marriage, Kristy and Tommy who visited, but lived with their father. Respondent indicated that he and petitioner separated in 1999 and divorced in 2003, and that he has been visiting with the children since 1999, according to a schedule of visitation which included two days during the week and overnight visitation every other weekend. Respondent indicated that he became a U.S. citizen in 1999.
Respondent denied making "anti-American" remarks or "anti-women" comments in front of the boys or otherwise. Additionally, respondent denied criticizing or denigrating petitioner in front of the children and further denied telling the children he was going to take them to Turkey and put them in school there or that he would go to Turkey and never return.
Respondent testified that when he saw his children for visitation on October 6, 2004, he observed a cut on Kerim's lip and bruises on Kenan's legs. Respondent asserts that Kenan told him that "they hit me" and respondent thereafter called his lawyer and "911". While respondent stated that he called the doctor right away, the doctor's office was closed. Respondent indicated that the police spoke to him and the children and told him that the children could stay with him. When respondent was asked whether he sent the children to school during the period they remained with him, he said that the police told him not to. On cross-examination however, respondent testified that police did not tell him to keep the children out of school, but only told [*5]him not to send the children home. Respondent indicated that he was "obliged" not to send the children to school, did not contact the school and did not get the children's homework for the days they missed.
 Respondent stated that on October 8, 2004, he took the children to Court to get an order of protection on their behalf and brought the children to Court again on October 12, 2004, in response to petitioner's application for a Writ of Habaes Corpus. Respondent indicated that the children were afraid to go inside the Courthouse when they saw Mr. M. and cried when they were told they had to go home with their mother. Respondent indicated that he told them to "be calm", that "no one's going to hurt you" and that your mother's boyfriend won't be there when you go home".
Respondent stated that the last time he saw the children was at the end of October of 2004. Respondent testified that he did not exercise visitation after the Court ordered that it be supervised, because it would be "disturbing" for the children. Respondent further admitted that he has not called the children since October, but stated that when he tried to call prior to that, petitioner would "hang up". Respondent also maintains that Kenan told him that petitioner "would lock the room where the phone is". When respondent was asked when the last time he called to speak with the children, he replied, "I don't remember, one or two years."
On cross-examination when respondent was asked whether it would be better to see the children via supervised visitation than not at all, he replied "I have no faults and my children have no faults...why should I see the children with a supervisor...I don't deserve that."
Respondent was also questioned about whether he physically abused petitioner and admitted that in 1999, he was convicted of third degree assault against petitioner. However, respondent contends that "I just pushed her away" and that she fell and hit her head on the sofa. Respondent claims that he pled guilty to assault because he wanted to see his children and that he went to an anger management course for fifty-two weeks upon the advice of his attorney. Respondent was placed on probation for three years which ended August of 2003. While respondent testified that he also had supervised visitation at D.S.S. four and a half years ago, in response to a neglect proceeding against him, he claimed that "I just went along with what they said."
Respondent testified that he filed the instant petition for a change of custody because the children are "not in good hands". Respondent alleges that the children are not properly clothed, that they complain that petitioner comes home late and that petitioner's boyfriend, who lives with petitioner, smokes and drinks and takes care of them when petitioner goes to work. He states that the boys have told him that they are afraid to stay alone with Mr. M..
Respondent testified that he works as an attendant at a gas station owned by his brother and made $13,000.00 last year, but that his brother "helps him out" and that his wife earns money cleaning the store. He indicated that he pays child support of $286.00 per month per the parties' agreement and buys eyeglasses for the children. He also maintains that petitioner told him that she'd take care of the children's medical coverage even though petitioner has sought medicaid on behalf of the children.
Respondent states that he has a three bedroom home with a large garden and that each boy would have their own room. Further, he stated that he is a U.S. citizen and does not want to live in Turkey. Respondent admitted that he is unable to read or write in English, but that he and his [*6]wife are planning to take English lessons. When asked how he would help the boys with their homework, respondent replied that he would rely on his sister-in-law or nephews and that his brother has suggested a tutor to help the boys. Respondent also indicated that his sister-in-law would be able to help him in understanding doctors, if the children needed medical care, and to interpret any letters regarding the children. Additionally, respondent states that he would enroll the children in counseling, if awarded custody.
Respondent testified that petitioner never discussed relocation with him, prior to the filing of her petition, but that the children have mentioned petitioner's intentions to take them to Arizona. Respondent was unable to remember whether he received a letter from petitioner's attorney two weeks before the children said they were assaulted by Mr. M., regarding her desire to relocate. He claims that the children have told him that they do not want to go to Arizona because they do not want to be separated from him, their half-siblings or friends. Respondent opposes petitioner's application for relocation to Arizona, stating that the children would be too far away and that he is "afraid for them".
Petitioner testified that she has been a "catering waitress" since April of 2000, earning approximately $11,000.00-$12,000.00 per year, and that her divorce from respondent was finalized in July of 2003. Petitioner states that she met Mr. M. in October of 2002, and that he resided with them since May of 2003, before they married in January of 2005. Petitioner stated that Mr. M. paid for her divorce and purchases groceries, gas and whatever else she cannot afford. Petitioner states that she has two older children from a previous marriage, Kristy and Thomas and that their main source of support is their father, whom they reside with Mondays through Thursdays. Petitioner stated that while Kerim and Kenan have a close relationship with their half-siblings, her daughter will be going to college next year and her son will be in his last year of high school, therefore the impact of their relocation on their relationship will be minimal.
Petitioner stated that respondent was convicted of assaulting her and that she has been the victim of many incidents of domestic violence by respondent, most stemming from respondent's jealousy. Petitioner described a particular incident which occurred in 1999, in which respondent became enraged because the boys were dancing and listening to music and that he grabbed her by the throat and threw her around. She testified that when respondent proceeded to punch her, that the boys pleaded with him not to hurt her. Petitioner indicated that respondent threw her into the arm of the couch, she bumped her head and fell to the ground and that while she was gasping for air, respondent threw water on her because he thought she was passing out. Petitioner indicated that she was taken to the hospital after the incident occurred. Petitioner states that her daughter was also injured in the incident when she tried to intercede and respondent grabbed her by her arm and threw her to the floor.
Petitioner admits that there was an "indicated" C.P.S. case against her for failure to protect her daughter from respondent during this incident and that she was granted and A.C.O.D. in that matter. As a result, an order of protection was issued against respondent on behalf of the children and that the order is still in effect on behalf of Kristy and Thomas, petitioner's two other children.
Petitioner also testified that in 2000, she received a call from respondent who told her that his brother saw her with another man and that after she hung up, respondent proceeded to call her fifty-three times, throughout the night. While petitioner called police and respondent was [*7]arrested, petitioner claims that the case was dismissed upon respondent's promise not to violate his probation again.
 Additionally, petitioner described a third incident in which respondent dragged her by her hair while she was pregnant with her son and a yet another incident in 1994 in which she went to the hospital after respondent physically abused her. She testified that at that time, she lied to police and told them that she slipped in the shower because she was afraid.
While petitioner admits that the boys love their father and miss him, she states that they are afraid of him as well. Petitioner testified that when the boys return from visitation with respondent, that they tell her their father says "bad" things about her like "your mother's a hooker" and that "it's your mother's fault that our marriage broke up, she destroyed the family". Additionally, petitioner states that the children tell her that respondent threatens to take them to Turkey and put them in a different school there.
Petitioner contends that in accordance with the parties' stipulation (Petitioner's Exhibit "8"), her attorney notified respondent by letter dated September 23, 2004, of her intention to relocate, and two weeks later respondent made the false allegations against Mr. M.. Petitioner states that respondent coerced Kenan into making the false allegations by threatening to go back to Turkey if he refused and that this was respondent's way of preventing their relocation. Petitioner explained that children come home bruised all the time and that the bruise on Kenan's leg was from a bike accident. Furthermore, petitioner states that Kerim was holding onto Mr. M.'s leg and accidentally bumped his lip when Mr. M. backed up.
Petitioner testified that the boys love Mr. M. and that he plays with the children and helps them with his homework. Petitioner testified that Mr. M. owns "Colorado Vista R.V. Park" in Bullhead City, Arizona, and travels back and forth constantly for the business and that she plans to work with him there, if granted permission to relocate. Additionally, Mr. M. purchased a lot there to construct a home upon, but she states that if they were unable to build a home, it would serve as an investment. Petitioner alleges that she is able to provide a better life for the children in Arizona and will be able to spend more time with Kenan because she won't have to work late. Petitioner also states that she intends to continue the children in counseling in Arizona.
In support of her petition to relocate, petitioner submitted a detailed income and expense report showing her income in 2004 to be $20,984.16, as compared to expenses of $44,343.20. Among the expenses included were: $1,200.00 for "restaurants", $1,200.00 for "trips and vacations", $600.00 for "activities", $1,800.00 for "babysitting" and $1,440.00 in "gifts"(Petitioner's Exhibit "4"). Additionally, petitioner admitted that they go to Casinos and have taken the children there as well.
Additionally, petitioner submits an income and expense report for Mr. M.'s Colorado Vista resort in Arizona showing income for the business in 2004 to be $98,872.00 as compared to operating expenses of $45,686.00. The assets and liabilities for 2004 were shown as $648,695.00. Further, petitioner's submissions include pictures and plans of the four bedroom home that they intend to build.
Petitioner testified that they researched the schools the children would be attending the Sunrise Elementary School" and the "Fox Creek Middle School". Petitioner states that Mr. M. visited the Sunrise Elementary School and spoke with the principal and that it is a brand new school. Petitioner indicates that Kenan was doing poorly in school but has brought his grades up [*8]a lot and that Kerim does well. Petitioner expresses concern over alleged incidences of violence in the Longwood High School such as "a stabbing" and "homemade bombs" as well as the number of sex offenders living in her area.
Petitioner states that she is currently unable to "make ends meet" and relocation would put her in a better financial situation as it is not as expensive to live in Arizona. She claims that if she remains here, eventually she would lose her house due to the high cost of living on Long Island. Petitioner currently has a $20,000.00 mortgage with $8,000.00 in taxes per year and her home is valued at approximately $350,000.00 to $360,000.00. Petitioner reports that she pays $1,041.00 for her mortgage and taxes per month. Petitioner states that she plans to allocate some of the proceeds from the sale of her home to the purchase of her new home and some to start a "mini-storage business". Petitioner indicates that it will cost $60,000.00 to build their home in Arizona upon land which she and Mr. M. presently own in a "nice and quiet" neighborhood and that the area of Bullhead City has a population of approximately 35,000 with stores, a local hospital, neighborhoods and kids.
Further, petitioner states that she has always allowed the children access to respondent and that they can always call him if they wish to. Moreover, petitioner indicated that they would pay the cost of respondent or the boys to travel back and forth to see each other, and would obtain housing for respondent while he visited as well. Additionally, petitioner maintains that respondent could communicate with the children via the internet and that she would send videotapes as well.

Ann B., petitioner's mother testifed that she was an Art teacher for the Longwood High School and retired in 1999, and that she babysits for Kenan and Kerim when petitioner works. She testified that when she came to Court with petitioner on October 12, 2004, the children were visibly upset. Mrs. B. stated that the children "froze up" upon seeing her and petitioner and that it wasn't until their father left that they hugged their mother and told them "we're not allowed to hug you or mom or "Baba" [Dad] will never see us again." Further, Mrs. B. stated that both Kenan and Kerim "broke down" and said "I'm sorry Mom, I had to lie".
Ms. B. describes her daughter as "an excellent mother, who has made mistakes, but does everything for the boys". She states that her daughter spends hours on homework with the children and that the boys are very clean. Further, Ms. B. describes Mr. M.'s relationship with the children as "excellent" and states that he is "mellow and patient" with the boys.
Ms. B. testified as to the incident of abuse by respondent which occurred in 1999, stating that she received a call from her daughter who asked her to come over and that when she arrived, her daughter was wet and shaking. Ms. B. indicated that she could feel a lump and actually see the imprint of fabric on her daughter's head and that her granddaughter "Kristy" had a mark on her arm. She stated that Kenan and Kerim were present and were "scared" and "hyper" and that petitioner told her to call an ambulance.
Ms. B. stated that Kenan and Kerim discussed the incidents of violence with her and asked for clarification because their father told them that petitioner beat him up. Ms. B. also stated that the children have told her they fear for her safety and that they said to her "he's going to hit you, he's going to smash your car", "don't go near the door, Baba's there, he's going to hurt you, he says you're bad, you put him in jail."
[*9]
Ms. B. states that while she would not be able to see the children as much if they moved to Arizona, that she would call and write to them and that if they came here, they could stay with her.
Mr. Beat M., petitioner's husband, testified that he was born Thailand, is a Swiss and Canadian citizen and his application for permanent residency in the United States is currently pending and indicates that after he receives his permanent residency status, he will apply to become a U.S. citizen. Mr. M. was previously married in 1985, divorced in August of 2004, and has no children from this union. He states that he has known petitioner since October of 2002, that he moved in with her prior to her divorce, in 2003, and that they married in January of 2005. Mr. M. explained that he felt it appropriate to move in at that time, because she needed financial and emotional support, as well as help with the children. Mr. M. states that he has been to school functions for the children and has met with the school social worker, Mr. K once or twice. He indicated that he and petitioner asked Mr. K to write a letter and to "say what he knows", after respondent made false allegations against him. Further, Mr. M. indicated that they went to see Mr. K in April of 2004, after the children reported that while they were in a Florida hotel with respondent, they were put in the hallway and overheard respondent "shoving, shouting, and hitting his new wife." Additionally, Mr. M. indicates that he sees Dr. N. every two weeks when he takes the children for therapy.
Mr. M. states that he has owned a "fifty-site, R.V. park" in Arizona, since 2001, which needs to be more developed and requires him to be there. Currently, he travels back and forth and has a friend run the business there. Mr. M. explains that the R.V. park has a $315,000.00 mortgage on it and is in joint ownership with his ex-wife, but that he is to get the R.V. park, while she is to get an apartment building. Mr. M. stated that the mortgage is paid by income from the business and will not be paid by proceeds from the sale of petitioner's home.
Prior to this, Mr. M. stated that he owned another R.V. park in Arizona between 1995 and 1998. Additionally, he states that he owns a plot of land in Bull Head City and submited a floor plan of the pre-manufactured house to be constructed (Petitioner's Exhibit "4") in which both boys would both have their own rooms. Additionally, Mr. M. states that the boys are "water rats" and would enjoy the many "summer type activities" in Arizona, which has a warm climate for most of the year.
Mr. M. indicates that if the Court denies relocation, he will have to travel back and forth to Arizona and spend more time there preparing to sell the business in two or three years. Mr. M. testified that he would pay for respondent to come to Arizona to visit and provide accommodations while there and that if the Court orders visitation in New York, that he would arrange it.
Respondent testified on rebuttal that petitioner "gave up" her two other children to their father and that petitioner did not have to drive him back and forth to work as she contends. Respondent further reiterated that he only first learned of Kenan's "ADD condition" in Court and that petitioner never mentioned it to him. Additionally, respondent claims that petitioner threatened to have him arrested if he went to the children's school. Further, respondent explained that he hasn't called the children because he has to be "supervised", and does not want to get arrested. Respondent admits that he doesn't know who the childrens' doctors or teachers are.
Respondent also testified that petitioner's mother was "lying", that she never liked him and [*10]always looked down upon him because he pumped gas. Respondent states that when they were married, petitioner told him that "my family doesn't like you and they don't like me". Respondent denied ever putting the children in the hallway of a hotel in Florida while he argued with his wife. Respondent's wife denied the incident as well.
Respondent reiterates that he has never made "anti-woman" or "anti-american" remarks and that he is a U.S. citizen and gave up his Turkish citizenship. Further, he states that his Turkish passport is expired.
The Court conducted an in-camera interview with both children, and without disclosing what they said, has considered what they said in coming to its decision.
LAW
The petitioning party seeking a change of custody must show a sufficient change in circumstances reflecting a real need for change in order to insure the continued best interest of the child (see, Carnrike v. Kasson, 291 AD2d 680 (3d Dept. 2002); see also, Fox v. Fox, 177 AD2d 209 (4th Dept. 1992)). In determining the best interest of the child where a change of custody is sought, the court considers such factors as the original placement of the child, the length of that placement, relative fitness of parents, quality of home environment, parental guidance given to the child, parents' financial status, and parents' ability to provide for the child's emotional and intellectual development (Dr. Santoro v. Dr. Santoro, 638 NYS2d 478 (2d Dept. 1996)). Custody of children should be established on a long term basis, wherever possible; children should not be shuttled back and forth between divorced parents merely because of changes in marital status, economic circumstances or improvements in moral or psychological adjustment, at least so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue as the proper custodian (Obey v. Degling, 37 NY2d 768, 770, 375NYS2d 91, 93 (1975); Matter of Miller v. Miller, 74 AD2d 663, 664, 424, NYS2d 771, 772 (3d Dept. 1980); see also, Matter of Wout v. Wout, 32 AD2d 709 (3d Dept. 1969)).
The Court has considered the respondent's application for a modification of custody in light of the relevant factors and determines that the best interests of the children dictate that custody remain with petitioner, Lisa B..
While respondent and petitioner both have home environments to offer the children which are physically appropriate, it is clear that petitioner is far more capable of providing for the emotional and intellectual development of their two children. Not only has petitioner remained the children's primary caretaker since the parties separation in 1999, she has insured that both children are in therapy and continues to be in constant contact with the school, through its social worker, Mr. K. Additionally, petitioner and her husband help the children with their homework, and provide the love, support and nurturing necessary for their emotional growth. Additionally, petitioner's husband not only provides needed financial support for the family, but emotional support as well. It is clear that both children love petitioner and Mr. M..
In contrast, not only does the Court find respondent incapable of providing for his children's emotional and intellectual needs, the Court determines that respondent's own actions to be both emotionally abusive and of extreme detriment to the children's best interests. This Court credits the testimony of petitioner as to the physical abuse inflicted upon her, both in and out of [*11]the presence of the parties' children. The Court is not persuaded by respondent's explanation of his conviction of third degree assault upon his wife, while in the presence of the children, by saying "I just pushed her". Indeed, the Court finds this to be further evidence of respondent's incredibility and cruelty.
Additionally, the court should also consider the effect that an award of custody to one parent might have on the child's relationship with the other parent (J.F. v. L.F., 694 NYS2d 592 (NY Family Court 1999)). "Interference with the relationship between a child and a non-custodial parent by the custodial parent has been said to be an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent." (In the Matter of Carl J.B. v. Dorothy T., 186 AD2d 736 (2d Dept. 1992)). Petitioner testified and the Court believes that respondent constantly disparages her by telling the children "your mother is a hooker" and that "she destroyed the family". This Court also believes that when the children appeared in Court on October 12, 2004, respondent forbade the boys from hugging their mother or their grandmother by threatening that they would never see him again. While alienation often arises when a custodial parent tries to interfere with the non-custodial parent/child relationship, as in the case cited above, in the instant case it is clear that respondent's blatant attempts to alienate the children from their mother render him unfit to act as custodial parent.
Furthermore, the overwhelming evidence supports petitioner's assertion that respondent pressured both Kenan and Kerim to make false allegations against petitioner's husband by threatening to leave for Turkey or to take them to Turkey. This coercive and abusive behavior is most poignantly detailed in Mr. K's letter, which states:
"Kenan indicated repeatedly and consistently that his dad had questioned and pressured him about his mother. At times, Kenan would say that his father threatened to go back to Turkey and that Kenan would never see his Dad again. These threats were the result of Kenan's unwillingness to talk about his mother with his father. Kenan has shared with me that his father routinely would say harsh and inappropriate comments about his mother. Kenan appeared fearful of his father's reactions. Kenan described his father's behavior toward his mom as scary." (respondent's exhibit B)
Moreover, the Court finds that it is unlikely that respondent will insure that the children attain the necessary therapy essential to their emotional well-being. The evidence indicates that respondent has told Kenan that "therapists make you hurt your father" and when respondent was asked why he does not avail himself of the supervised visitation he replied, "I have no faults and my children have no faults". This clearly demonstrates that not only is respondent completely unaware of the abusiveness of his behavior, but also the affect of it upon his children's well-being. It is clear to this Court that the emotional abuse inflicted by respondent upon his children not only dictate that custody remain with petitioner, but also require that respondent's visitation remain supervised until such time that respondent can conduct himself in an appropriate manner. In furtherance of this objective, the Court directs that respondent participate in individual counseling and parent effectiveness training.
The Court having determined that custody of the parties' two children is to remain with [*12]petitioner, must now address petitioner's application to relocate with the children to Bullhead City, Arizona.
"A relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child." Tropea v. Tropea, 87 NY2d 727, 739, 642 NYS.2d 575, 580 (1996); In the Matter of Rotering v. Rotering, 6 AD3d 718, 718, 775 NYS2d 182, 183 (2d Dept. 2004); In that Matter of Jennifer v. Anthony Dancy, 5 AD3d 768, 768, 773 NYS2d 595, 595 (2d Dept. 2004); Rutigliano v. Rutigliano, 5 AD3d 581, 581, 772 NYS2d 880, 881 (2d Dept. 2004). Relevant considerations in determining an application for relocation include each parent's reasons for seeking or opposing the move, the quality of the relationship between the child and the custodial and non-custodial parent, the impact of the move on the quantity and quality of the child's future contact with the non-custodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally, and educationally by the move, and feasibility of preserving the relationship between the non-custodial parent and the child through suitable visitation arrangements (see, Tropea v. Tropea, supra ).
The Court finds that petitioner established by a preponderance of the evidence that the proposed relocation to Bull City, Arizona is in the best interests of the children. Petitioner has been employed as a catering waitress since April of 2000, earning between $11,000.00 and $12,000.00 per year. Petitioner submitted a financial analysis detailing her current financial situation, and without consideration of approximately $4,400.00 in luxury expenses, petitioner's yearly expenses exceed her income by nearly $20,000.00. While the mortgage on her current home is $20,000.00, her taxes are reported to be $8,000.00 per year and her monthly mortgage payment is $1,041.00. Currently, petitioner's husband owns a recreational vehicle business in Bull Head City, Arizona and travels back and forth. The financial information submitted by petitioner shows that assets and liabilities of Mr. M.'s business in 2004, to be $648, 698.00, with income of $98,872.00 as compared to expenses totalling $45,686.00. Additionally, petitioner's husband purchased a plot of land upon which they intend to build a four bedroom home at a cost of $60,000.00, if relocation is permitted. Floor plans of home and pictures neighborhood were entered into evidence.
Petitioner also testified and that she and Mr. M. researched the schools that the children would be attending, and spoke with school officials there. Further, petitioner testified that relocation would enable her to spend more time at home with the children as she would no longer have to waitress. Petitioner indicated that she would be able to work a more flexible schedule at the R.V. park and that she intends to start a "mini-storage" business, with other people to run it. Petitioner intends to continue counseling for the children in Arizona.
As noted above, other relevant factors in determining an application for relocation include the quality of the relationship between the child and the custodial and non-custodial parent as well as the impact of the move on the quantity and quality of the child's future contact with the non-custodial parent. (see, Tropea v. Tropea, supra ). While respondent was awarded liberal and regular visitation in accordance with the parties stipulation of settlement in February of 2003, once the Court ordered that visitation be supervised during the pendency of these proceedings, respondent failed to avail himself of such visitation or otherwise initiate contact with the [*13]children. Even though he explained that it would be "disturbing" for the children to visit with him in a supervised setting, he did not consider the obvious impact of his failure to visit with or contact them at all.
Furthermore, while facts and circumstances which occurred prior to the last order of custody may not be determinative as to respondent's petition for a modification of custody, the background of domestic violence in this case as perpetrated by respondent against petitioner in the presence of their children, as well as respondent's purposeful acts aimed at alienating the children from their mother, are of grave concern to this Court, as they bear on the quality of respondent's relationship with his children.
Respondent has coerced and manipulated his children by pressuring them to lie about the alleged abuse by Mr. M. by threatening to leave and go to Turkey. Further, respondent used the very same threat when he forbade the children from hugging their mother or grandmother when they appeared in Court for the Habeas Corpus proceedings. Additionally, respondent subjected the children to the physical abuse he inflicted upon petitioner. The relationship respondent has created with his children is based upon his coercive, manipulative and abusive behavior and can only be deemed detrimental to their best interests.
The relevant factors set forth in Tropea are "non-exclusive", In the Matter of Ramirez-Cohen v. Church , 284 AD2d 472, 726 NYS2d 859, 860 (2d. Dept. 2001), and the Court is required to consider "all of the factors that may be relevant to the determination as to whether the proposed relocation would serve the child's best interest", Matter of Esposito v. Kepler, 788 NYS2d 169, 171 (2d Dept. 2005). While there is no doubt that supervised visitation will be somewhat more complicated by petitioner's relocation to Arizona, this Court finds for the reasons set forth, that relocation is in the children's best interests. The Court is not only persuaded by the respondent's present relationship with his children, but by petitioner's improved financial situation as a result of such a move, and the additional time she will be able to spend with them, as well as the emotional and financial support provided by both the petitioner and her husband. Mr. M. presented himself as a kind, loving and supportive influence in the lives of petitioner and her children and the children express their fondness and love for him as well. Mr. M.'s business in Arizona is successful and preventing relocation would require him to travel back and forth to Arizona, taking him away from petitioner and the children. Additionally, petitioner has agreed to pay for costs of transportation associated with respondent's visitation.
Accordingly, this Court concurs with the law guardian's recommendation, and grants petitioner's application to relocate to Arizona with the parties' children and directs that visitation with respondent remain supervised. Supervision may occur in New York or Arizona, with supervision to be by an authorized agency in either state or by a individual or agency mutually agreed upon between the parties.
Petitioner will be responsible for the transportation costs associated with respondent's visitation, up to a maximum of six visits per year.
Visitation shall occur during the summer months or on the children's school vacations.
Respondent shall be permitted to communicate with the children by telephone or internet or other equivalent electronic means.
Respondent is directed to participate in individual counseling and a parent effectiveness program and may seek modification of the order of supervised visitation upon a showing that he [*14]has obtained the mandated counseling.
This constitutes the final order of the Court.
ENTER
 
 HON. ETTORE SIMEONE
 J.F.C.